RESTRICTED DOCUMENT

| | |
|---|---|
| A.2.2.b | Security and Control |
| A.2.2.c | Safety and Sanitation |
| A.2.2.d | Food Service |
| A.2.2.e | Detainee Grievance Program |
| A.2.2.f | Staff Training/Professional Certifications |

**Detainee Records:**                                                         **Non-Compliant**

| | |
|---|---|
| A.3.2 | Each Detainee Custody Record will include the following: |
| A.3.2 a | Intake/Booking information |
| A.3.2 b | Cash and property receipts |
| A.3.2 c | Reports of disciplinary actions, grievances, incidents, or crimes(s) committed while in custody. |
| A.3.2.d | Records and program participation |
| A.3.2 e | Work Assignments - no |
| A.3.2.f | Classification Records |
| A.3.3 | The contents of inmate Records are identified and separated according to a format approved by the facility Director. |

**Facility Admission & Orientation Program:**                          **Non-Compliant**

| | |
|---|---|
| A.4.5 | Prior to being placed in the general population, each inmate is provided with an orientation to the facility, which includes at a minimum |
| A.4.5a | Written materials describing facility rules and sanctions |
| A.4.5b | Explanation of mail and visiting procedures |
| A.4.5c | Explanation of transportation options for visitors |
| A.4.5d | Explanation of grievance procedures |
| A.4.5e | Explanation of all fees, charges, or co-payments that may apply |
| A.4.5f | Explanation of services, programs, and eligibility requirements |
| A.4.5g | Information on how to access health care |
| A.4.5h | This information is contained in a written Handbook that is given to every inmate |
| A.4.5i | The Handbook is translated into those languages spoken by a significant number of inmates |
| A.4.5j | Sexual Assault Prevention/Intervention |
| A.4.5k | Sexual Assault Self-Protection |
| A.4.5l | Reporting sexual abuse/assault |
| A.4.5m | Sexual Assault Treatment and Counseling |
| A.4.7 | Detainees verify, by signature, the receipt of their initial orientation and of their Inmate Handbook and written orientation materials.  Signed acknowledgement of the Signature is maintained in the inmate's File. |
| A.4.8 | If a Detainee cannot read orientation materials they are read to the inmate by a staff member, or are provided through the use of an audio or video tape.  For inmates who do not speak English, interpretive services are provided. |

**Staffing:**                                                                                    **Non-Compliant**

A.9.1        A comprehensive staffing analysis is conducted annually.
A.9          Background investigations include:
A.9.3a       Criminal History
A.9.3b       Employment References
A.9.3c       Credit History
A.9.3d       Verification of US citizenship
A.9.3e       Pre-Employment interview
A.9.3f       Drug Screening
A.9.6        The facility conducts periodic re-investigations of employees, contractors, and volunteers.

**Training:**                                                                                    **Non-Compliant**

A.10.3       All new professional and support employees, including contractors, who have regular or daily inmate contact receive training during their first year of employment.  Forty hours are completed prior to being independently assigned to a particular job. An additional 40 hours of training is provided each subsequent year of employment.  At a minimum, this training covers the following areas:
A.10.3.a     Security procedures and regulations
A.10.3.b     Supervision of inmates
A.10.3 c     Signs of suicide risks
A.10.3.d     Suicide precautions
A.10.3.e     Use-of-Force regulations and tactics
A.10.3.f     Report writing
A.10.3.g     Inmate Rules and Regulations
A.10.3.h     Key Control
A.10.3.i     Rights and responsibilities of inmates
A.10.3.j     Safety Procedures
A.10.3.k     Interpersonal relations
A.10.3.l     Social/Cultural lifestyles of the inmate population
A.10.3.m     Cultural diversity
A.10.3.n     Communication Skills
A.10.3.o     Cardiopulmonary resuscitation (CPR)/First Aid
A.10.3.p     Counseling techniques
A.10.3 q     Sexual Harassment/Sexual misconduct awareness
A.10.3.r     Code of Ethics


## 2.  Health, Mental and Dental                                                 Acceptable

The DACDC Medical, Nursing, Dental and Mental Health services are provided by Corizon Health. The Corizon Health employees are responsible for all clinical care of the detainees.  The services are provided 24 hours per day, seven (7) days per week.  The staffing includes the Health Service Administrator (HSA) as the designated health authority, the Director of Nursing (DON), Physician,

RESTRICTED DOCUMENT

Global Corrections Group
Needs Assessment Review (NAR)

Dona Ana Detention Center
February 8-12, 2016

Nurse Practitioners, Registered Nurses (RN), Licensed Practical Nurses (LPN), Psychiatrist, Nurse Practitioner, Mental Health RNs, 4 Counselors, Mental Health Technicians, clerical and pharmacy technician. There are also lists for all positions that can fill in for time off and illness. Currently the Physician's position is vacant, but a new Physician is scheduled to start February 22, 2016.

Recently, the County Public Health Service notified the facility that because of a decrease in their budget their services at DACDC would be reduced to immunizations only. The reduction of services involved many women's health services, female history and physicals, STD testing, Hepatitis-C testing, chronic care for HIV+ detainees and substance abuse counseling.    The HSA has requested a RN for 40 hours and a Certified Nurse Practitioner for 20 hours to assist with these new duties.

The job descriptions and credentials for health staff are organized in a Binder in the HSA's and DON's office. The Nursing Encounter Tools (NETS) are used by the triage nurses to do sick call.  They were signed November 25, 2014 by the Regional Medical Director and HSA.    The Corizon Policy and Procedure Manuals and Clinical Pathways were also signed on this date.  The facility also follows the New Mexico Association of Counties Standards.

Skilled nursing care and observation cells are located in a Pod adjacent to the Medical Department and nursing station. This Pod has 23 beds that include three (3) negative pressure rooms, contact isolation, suicide watches, non- compliant detainees with treatment plans and observation for preparation for laboratory or x-ray tests. The detainees' health meets the definition of an "Infirmary" as stated in the Standards, however, DACDC does not identify the Medical Pod as an infirmary.  Observation of how a detainee notifies Medical staff revealed the detainee intercom system only notifies the Officer and then the Officer notifies the Nurse's office.  The intercom system should simultaneously notify the Officer and Nurse's station.

There are no specific Nursing Policies and Procedures for the Medical Pod and admission and discharge of detainees in the Medical Pod are not always ordered by a Physician. A review of detainees' charts show there is no documentation of a patient's activities and treatments while in the Medical Pod. Additionally, there is not a Physician on call 24 hours a day.

Emergency and in-patient services are provided by Memorial Medical Center and Mountain View Regional Hospital in Las Cruces.  OB-GYN services are provided by First Step Clinic, also in Las Cruces. Dona Ana County AMR provides ambulance service to the facility. Sick call requests are sent to Medical, Mental Health and Dental from a Kiosk in the housing Pods. The sick call requests are triaged seven (7) days per week by an RN. Sick call is scheduled within 24 hours of the receipt of the request.   Regular medications are ordered from Pharmacorr and received by United Postal Service carrier in one day if ordered by 11:00 AM or 2 days if ordered by 2:00 PM. Emergency medications and parole medications are ordered from Walgreens.  Medications are delivered to the Pods 2-4 times a day by LPNs.  Insulin injections and blood sugars are administered in the Nursing Station.

The Pharmacy is in another part of the facility. Three (3) medication nurses work out of this area.  The entrance to the pharmacy was double locked.  Narcotics and other sensitive medications that must be signed out are locked in a secure cabinet.  All medications are administered from stock bottles.  There are three (3) nurses with three (3) medication carts that go from Pod to Pod delivering medications.

Only physician-ordered narcotics are in the medication carts at a given time.  Approximately 200 detainees take psychotropic medications.

Needles, syringes and tools are stored in a locked cabinet in an examination room which is only secured with one (1) lock. This is not a secure cabinet as it is pressed wood and the lock could easily be removed. The instruments and disposable sterile kits should not be stored in the same cabinet.  The tools, i.e., scissor and toenail clippers were inaccurately hung on a shadow board.  There are three (3) sets of keys carried by the charge nurse, DON and the HSA.  The door to the room was never closed during the visit, therefore, the sensitive items were not secured. The crash cart contains sensitive items and the sealed tag number was checked weekly and not between shifts as required for sensitive items.

The Intake Screening is completed by an LPN in a small private room across from the officer's desk. Detainees are not accepted into the jail with significant injuries or life threatening intoxication and must be cleared by the hospital emergency room staff to be considered "fit for confinement." The detainee is screened for Medical, Dental and Mental Health issues.   If any significant problems are found, the LPN refers them to the appropriate health care professional. Chronic care detainees are identified at Intake and are referred to the Chronic Care Clinic. They are seen every ninety (90) days after the initial appointment. A history and physical are completed by an RN on the 10th day after Intake. Nurse Practitioners receive appointments by referral from the LPN or RN. Verified community Prescription medications are continued.  Symptoms of suicide are carefully screened at Intake and immediately referred to Mental Health if present.

The HSA is responsible for the Infection Control Program and the Continuous Quality and Safety Improvement Program (CQSI).  CQSI reviews are completed monthly and reported every other month to the Facility Directors. Detainees are screened for infectious diseases and communicable diseases. If the detainee cannot remember where he was tested for TB and the results, then they are tested for TB. The Purified Protein Derivative (PPD) is usually given immediately and read in 72 hours while the detainee is still in Booking.  X-rays are taken at the local hospital if a detainee has had a positive PPD. Infection Control and Quality Improvement statistics are shared with the Director and reported to Corizon Health.

All Dental complaints are triaged by an RN and appointments made for the weekly visit of the Dentist. There has been no Dental Assessment training for the staff.  Flammable chemicals were not contained in an approved flammable cabinet.  Material Safety Data Sheets are only available in the nurses' station and need to be accessible in the area where the materials are located.  Tools are sterilized, but there were no dates on the packages.  A broken instrument was not destroyed appropriately.  Instruments were inventoried correctly. The Dental X-ray machine is not inspected annually.

The Mental Health appraisals are not done between 10-14 days after arrival by the Psychiatrist or Psychiatric Nurse Practitioner. The Psychiatrist is present in the facility 40 hours per week and is currently the acting Medical authority. There has been an increase in Mental Health staff with a lawsuit settlement.   DACDC has several Pods that only house severe Mental Health detainees.  There are staff members trained to work with these detainees.  There is a weekly meeting with Mental Health staff, Security, Classification and Medical.  The detainees are reviewed weekly and may stay in their current Pod or move to another Pod with less restrictions.  The detainees are most often on psychotropic medications.  Counselors are also available for groups and individual counseling sessions.  The facility

RESTRICTED DOCUMENT

only uses a restraint chair for minimal amounts of time to redirect behaviors or administer Physician-ordered medications to calm a detainee. Fifteen minute checks are done by trained security staff in the Medical Pod.

The detoxification protocol is approved by the Physician and implemented on his approval when a detainee is admitted in Intake. This protocol is well written and easy to follow. If the Blood Alcohol Content exceeds .29, the detainee is sent to the Emergency Room for clearance. Some detainees are ordered by the ER to be held for twelve hours in a holding cell at DACDC. These detainees are briefly screened for urgent problems. The detoxification protocol varies in relationship to the drugs or alcohol used by the detainee.

The Suicide Prevention Plan is taught initially during employee orientation. The lesson plan contains all the necessary bullet points. There is one hour of documented annual training for suicide prevention.

The First Aid kits are located in two (2) areas of the facility designated by the Safety Officer. The contents or location of the First Aid kits were not approved by the HSA/RN. This process does not meet the standards. There is a 4 minute response time taught in initial orientation, but not annually. CPR is also taught initially and is renewed every two years for all employees. The Health Service staff is knowledgeable and trained in emergency procedures. There is emergency equipment available to include AEDs and a well-stocked crash cart.

Detainees are screened in the Booking Area for assaultive behaviors or sexual victimization. If they meet the criteria, they are monitored and are often placed in specifically identified Pods. Additional training is needed for staff regarding the Prison Rape Elimination Act and the identifying factors.

The response to a detainee's death is considered a "significant incident," and it is the responsibility of the HSA. This Policy and Procedures Manual is only kept in the HSA's office in another building. All Medical staff should have access to this Manual and sign that they have read and understood the information. Medical and Mental Health autopsies are completed by the appointed clinical staff.

Health information and Medical Records are held confidential. Corizon Health has some forms of the chart provided electronically, and the remainder of the chart is paper/hard copy. The computer terminals and the paper Medical Records are in restricted areas from detainees. Medical and Mental Health Records are kept separate and must be stored for ten (10) years. Informed consents are signed at Intake, for invasive surgeries and for psychotropic medications. If a detainee refuses to sign, then two (2) staff members must witness the informed consent.

**Health Care Administration:**                                   **Non-Compliant**

B.1.12      First Aid Kits are available in designated areas of the facility as determined by the designated health authority in conjunction with the facility Administrator. The health authority approves the contents, number, location, and procedures for monthly inspection of the kits and written protocols for use by non-Medical staff.

**B.2. Intake Health Screening:**                                   **Non-Compliant**

B.2.7.b    Observation of the following: behavior including state of consciousness, mental status, appearance, conduct, tremor, and sweating body deformities and other physical abnormalities.  Ease of movement of the skin, including trauma markings, bruises, lesions, jaundice, rashes, infections, recent tattoos, and needle marks or other indication of drug abuse.  ACA-4-ALDF-4C-22 NCCHC J-E-02

B.2.7.b.1  General appearance, behavior and observation of the following: General appearance and behavior, Evidence of abuse and/or trauma, Current symptoms of psychosis, depression, anxiety, and/or aggression 4-ALDF-4C-29 4-ALDF-4D-22-4

**Medical, Mental Health, and Dental Appraisals:**                    **Non-Compliant**

B.4.9      Health encounters including Medical and Mental Health interviews, examinations, and procedures are conducted in a setting that respects the inmate's privacy. Female inmates are provided a female escort for encounters with a male health care provider.  4-ALDF-4D-19

**Provision of Health Care:**                                        **Non-Compliant**

B.5.1      If infirmary care is provided, it includes at a minimum the following (4-ALDF-4C-09; NCCHC J-G-03)
B.5.1.a    Definition of the scope of infirmary care services available
B.5.1.d    Detainee patients are within sight or sound of a qualified health care professional
B.5.1.e    A Manual of Nursing Care procedures is consistent with the state's Nurse Practicing Act and licensing requirements
B.5.1.f    The frequency of Physician and nursing rounds is commensurate with the category of care being provided
B.5.16     Detainees have access to a chemical dependency treatment program. 4-ALDF-4C-37

**Incident Health Care:**                                            **Non-Compliant**

B.6.1.a    The facility Suicide Prevention Program is approved by the health authority and the facility Warden or designee.
B.6.1.h    Suicide review debriefings include administration, health services, and security representatives.
B.6.3.b.3  Documentation of 15-minute checks by health-trained personnel or health services of detainees placed in medical restraints
B.6.5.b.3  Treating staffs are informed of the clinical mortality review and administrative review findings.

RESTRICTED DOCUMENT

## 3.  Security and Control                                          Deficient

The review of the Security and Control Program included staff interviews, a review of the facility's Policy and Procedures, and direct observation of the operation. The facility's Master Control is located in a sally port that is centrally located in the Dona Ana Detention Center. Master Control is equipped with video surveillance monitors, electrical locking system, emergency keys, a fire alarm system, radio communication and an intercom system. Master Control is staffed 24 hours a day, seven (7) days a week. Facility policy requires a minimum of two (2) Officers. It was observed this is not always adhered to. Correctional Officers' Posts are located throughout seven (7) various inmate living areas which include male, female and juvenile detainees. Officers were observed conducting 30 minute security checks on detainees who are classified as maximum and medium security as well as documenting these security checks. However, some documentation was not submitted within the specific time allotments. A review of the Officers' Logs indicated low and minimum security detainees requiring 60 minute security checks are not being conducted per FPBDS. A review of permanent Logs indicated Correctional Supervisors are not always conducting reviews of all permanent Logs on each shift and no documentation could be found that inspections of unoccupied areas are being conducted at least weekly. Additionally, there is no documentation indicating weekly inspections are being conducted on all security devices.

DACDC utilizes the "J CORR" software system to document detainee admissions and releases from the facility. DACDC has a system for physically counting detainees and the facility performs five (5) formal counts daily. Facility policy regarding population count procedures are vague and does not provide needed guidance. Observation of the count revealed one (1) Officer performs Pod counts, however, DACDC Population Count Policy states that "Officers" shall conduct a 'face to photo' count. The 'face to photo' count is not uniformity performed by Pod Officers as observed in several Pods. Facility policy identifies count times by hours however, counts were conducted prior to the formal count times and detainees were permitted to move within the facility. Notification to detainees regarding count time varied from Pod to Pod which led to detainees not being secured in preparation for count.

Policies and Procedures are in place for searching the facility. DACDC Policy and Procedures also govern the confiscation, preservation, control and disposition of all physical evidence and contraband however, the facility does not follow procedural standards when controlling and disposing of contraband. A review of three Contraband cases revealed the facility policy on Contraband/Disposition of Evidence has not been followed.

A search of all detainees' body and attire is conducted upon their arrival to the facility; however, the pat searches observed, were conducted more as a formality versus a tool to deter the introduction of contraband. It was observed that detainees departing the detention center were not being visually searched according to standards. Handheld metal detectors were not seen being utilized during this review. There is no documentation that indicates walk-through metal detection/body orifice scanner(s), or "boss chair" are being tested or calibrated.

Procedures for notifying the U.S. Marshal Service (USMS) of significant incidents do not exist in facility policy. USMS Contract C (ODT-9-C-0004, Section C.4.2) "Incident Reporting" requires the facility to notify the USMS COTR of all serious disturbances, sexual assaults, food strikes, staff Use of

RESTRICTED DOCUMENT

Force, assault on staff, detainee fights requiring Medical attention (above routine post-incident examinations), fires, and Lockdowns. The facility's Use of Force Policy does allow staff to respond to an incident, assess the situation and take immediate action without a Supervisor present. Procedures are also in place in the event a detainee requires placement in four or five (4-5) point restraints. DACDC Policy, Procedures and Use of Force training strictly prohibits unnecessary or excessive Use of Force. Staff is provided training in Use of Force techniques during pre-employment and in-service training. A review of the Use of Force Policy revealed there are no procedures to obtain approval prior to any calculated Use of Force and no procedures to contact health services to determine whether or not there are any Medical concerns related to detainee. Four (4) 'Use of Force Incident Packets' were reviewed. A review of two (2) Use of Force packets revealed Policy and Procedures are not adequate and need to provide staff with guidance regarding specific actions that necessitate Use of Force. Policy does not address a Use of Force Review Committee to review, document and address any negative activity. Additionally, policies do not address procedures for immediately notifying the agency of jurisdiction following a Use of Force. Additionally, local policy does not provide procedures for how and who is to decontaminate staff/detainee after exposure to chemical agents.

DACDC Policy and Procedures regarding firearms, chemical agents, and other less than lethal munitions are addressed in the Use of Force and Restraint Policy. The policy addresses the use of deadly force, training, staff qualified to carry weapons and chemical agents. However, the policy does not address the Armory and who and how weapons and chemical agents are to be issued and accounted for.

Daily issued facility keys are maintained in the Master Control Center. Key Control is not being followed according to policy. Staff was observed with unsecured facility issued keys which allowed them to place keys on desks and various wall hooks throughout the facility. The Emergency Key ring is not stored in a separate area of the Master Control Center per facility policy. The Emergency Key Ring which includes the Armory Key is located in the Director's Office. Therefore, a supervisory Officer must retrieve the emergency ring, daily, which is not approved policy. A review of the facility Replacement Keys Inventory Documentation revealed these keys are not accurately accounted for.

DACDC has a key card system that is utilized to gain access into specific areas in the facility. Interviews with staff regarding the proper use of cards indicate staffs have not received formal training regarding the use of the key cards. There is no accountability or documentation of the cards when issued or lost. Additionally, a contractor who is responsible for the maintenance of the facility has been assigned oversight responsibility for the key cards. Observation of the use of the cards indicated they allow doors to simultaneously be open in the facility without Master Control receiving prior notification. Several observations were made regarding unescorted detainees being released at the same time in the hallways.

Accountability of tools and equipment in DACDC are the responsibility of a Contractor. There is no record of missing/lost tools. Interviews with staff regarding the procedures for reporting missing or lost tools revealed they were unaware of the proper reporting procedures. Tools that were inspected within the facility did not meet the minimum Accountability or Storage Standard requirements and were not properly marked and shadowed. Numerous locations had tool shadow boards without identifying what staff checked the tool(s) out. Additionally, ladders and bolt cutters are not properly stored, engraved or accounted for.

RESTRICTED DOCUMENT

Post Orders are outdated and Signature Sheets indicated missing staff signatures. There is no annual review conducted. On-site Post Orders had multiple dates listed, dating back to 2012.

During an observation of a detainee transport procedure, staff were observed not following facility policy regarding the safe and proper usage of the clearing barrel, proper accounting and storage of ammunition, and supervised safe handling of firearms.

The DACDC's Emergency Plans are not reviewed or acknowledged by signature that they have been read by facility staff. Emergency Plan Annual Reviews are not conducted. During interviews with Supervisory staff, they were not aware of their responsibilities in certain emergency situations.

DACDC has a policy on disciplinary procedures but they do not clearly define rules for offenses and penalties that can be imposed for various violations. However, the Detainee Handbook does identify specific prohibited acts of conduct within the facility and penalties that can be imposed. Detainees do not sign acknowledging receipt of the Detainee Handbook. There are no procedures to informally resolve minor rule violations. A review of several Hearing Packets revealed incident reports are investigated and sanctioned promptly. These Hearing Packets also indicated detainees are advised of their rights. However, there is no documentation to support whether inmates are provided with a copy of the Advisement of Pending Disciplinary Charges or a copy of the final disposition of charges. Detainees' disciplinary actions are maintained in the detainees' Institutional File(s).

The Facility's Disciplinary and Administrative Segregation Policies and Procedures were reviewed. Interviews were also conducted with the Lieutenant and Officers who work the Disciplinary and Administrative Segregation area. The facility has multiple Special Housing Units (SHU) for male detainees and one (1) unit for females. The Health Services Department conducts pre-segregation Medical evaluations prior to detainees being admitted to SHU. The male SHU unit had several detainees in protective custody status at the request of the detainee, facility intelligence or law enforcement agency. Facility Policy C.9.9 addresses the status of detainees in Administrative Segregation and Protective Custody. The policy states the status is reviewed every seven (7) days for the first two (2) months and at least every 30 days thereafter, however, documentation revealed not all reviews are being conducted within established time frames. Interviews with SHU staff and available documentation revealed SHU inmates are only being offered three (3) hours of outside recreation a week and not five (5)hours as required for the FPBDS.

DACDC transports detainees to court and locally for in-district movement. The transportation operation is staffed with one (1) Sergeant and four (4) transport officers. DACDC has a secure vehicle sally port and a secure area for the receiving and discharge of detainees. The facility's Intake area has several holding rooms for processing detainees transferring in and out of the facility. The facility utilizes the Dona Ana County Transportation Department for maintenance. The documentation produced indicated the last Annual Safety Inspection consisted of all ten (10) vehicles being serviced on January 1, 2015. When not in use, the transportation vehicles are kept in a secure parking lot located behind the detention center; however, when the vehicles were inspected to ensure they were secure, one (1) vehicle was found unsecured. Vehicles are equipped with serviceable air conditioners and compartments to provide for separation of detainees. Cell phones and detention center hand-held radios are issued to staff for communication needs while transporting detainees. Observation revealed Transport Officers are not searching vehicles for contraband prior to transport.

DACDC has no Policy or Procedure to document and admit official visitors into the facility. The facility only has one walk-through metal detector and it is located in the corridor prior to entering the secure facility. DACDC parking and perimeter lighting is poor and in need of additional lights. Six (6) light poles, which include the front parking lot and around the inner perimeter, were out. Patches of grass around the inner and outer perimeter fence are high and in need of maintenance.

## Security and Control:                                          **Non-Compliant**

| | |
|---|---|
| C.1.2 | The secure Control Center is staffed continuously. |
| C.1.3 | Correctional Officers' Posts are located in or immediately adjacent to inmate living areas to permit officers to see or hear and respond promptly to emergency situations. |
| C.1.4 | Prisoners classified as medium or maximum security risks are personally observed by an officer at least every 30 minutes on an irregular schedule. Prisoners classified as minimum or low security risks are personally observed by an officer at least every 60 minutes on an irregular schedule. |
| C.1.8 | Correctional staff must maintain a permanent Log recording routine information, emergency situations, and unusual incidents. |
| C.1.9 | Correctional Supervisors review permanent Logs on each shift to provide responsible department heads/Shift Supervisors with relevant information. These reviews are documented. |
| C.1.10 | Supervisory staff must conduct a daily patrol, including holidays and weekends, of all areas occupied by inmates. Unoccupied areas are to be inspected at least weekly. Patrols and inspections are documented. |

## Detainee Accountability:                                          **Non-Compliant**

| | |
|---|---|
| C.2.2 | The facility has a system for physically counting inmates. The system includes strict accountability for inmates being counted outside of their assigned living area. |

## Control of Contraband:                                          **Non-Compliant**

| | |
|---|---|
| C.3.2 | Procedures govern the preservation, control, and disposition of all physical evidence obtained in connection with a violation of law and/or institution regulation. At a minimum, the procedures address the following: |
| C.3.2.a | Chain of Custody |
| C.3.2.b | Evidence handling |
| C.3.2.c | Location and storage requirements |
| C.3.2.d | Manner of disposition |
| C.3.3 | A search of a Detainee's body and attire is conducted upon their arrival at the facility and prior to transportation out of the facility. |
| C.3.3.a | Detainees searched after contact with public or when returning from the public. |
| C3.3.b | Detainee searches conducted in an appropriate setting and by staff of same gender. |

RESTRICTED DOCUMENT

## Use of Force/Non-Routine Application of Restraints:                **Non-Compliant**

C.4.1    The use of physical force is restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, and then only as a last resort and in accordance with appropriate statutory authority.

C.4.8    The agency of jurisdiction is immediately notified of any Use of Force Incident or Non-Routine Application of Restraints.

## Weapons Control:                                                    **Non-Compliant**

C.5.4    Storage space is provided for the secure storage of less lethal devices and related security equipment, and this space is located in an area separate and apart from inmate housing or activity areas.

C.5.4    Access to the weapons storage space is restricted to authorized personnel.

C.5.6    The facility maintains a written Record of Routine and Emergency Distribution of Security Equipment.

C.5.7    Firearms, chemical agents, and related security equipment are inventoried at least monthly to determine their condition and expiration dates.

C.5.11   Appropriate equipment is provided to facilitate safe unloading and loading of firearms.

C.5.12   Incidents of missing weapons are reported promptly to Supervisory Security personnel.

## Keys, Tools, and Medical Equipment Control:                         **Non-Compliant**

C.6.1    The use of keys is controlled and inventoried.

C.6.2    Emergency keys:

C.6.2a   Are kept in a secure but accessible location

C.6.b    Reach every area of the facility

C.6.2c   Usage is limited to authorized staff

C.6.2d   Usage is documented

C.6.3    The use of tools and culinary equipment is controlled and inventoried.

C.6.6    Medical and Dental instruments, equipment, and supplies (syringes, needles, and other sharps) are controlled and inventoried.

C.6.7    Incidents of missing keys, tools, culinary equipment, Medical and Dental equipment, and supplies are reported promptly to Security personnel.

## Post Orders:                                                        **Non-Compliant**

C.7.7    There are current written orders for every Correctional Officer Post, which clearly outline duties, responsibilities, and expectations of that Post.

C.7.2    Post Orders for armed Posts contain instructions regarding the proper care and safe handling of firearms and specific instructions stating when and under what circumstances their use is authorized.

C.7.3    Officers assigned to those Posts acknowledge in writing that they have read and understand the orders and record the date.

C.7.4        The Facility Administrator or designee reviews Post Orders annually and updates them as needed.


**Detainee Discipline:**                                                    **Non-Compliant**

C.8.3        When minor rule violations or prohibited acts occur, informal resolutions are encouraged.
C.8.4        Incident reports are investigated within 24 hours of the incident. The disciplinary hearing is not convened before an investigation is concluded.
C.8.5        Detainees receive 24 hour notice of their disciplinary charges prior to the disciplinary hearing.

**Special Housing Units:**                                                  **Non-Compliant**

C.9.1        The facility Administrator or designee can order immediate segregation when it is necessary to protect the Detainee or others. The action is reviewed within 72-hours by the appropriate authority.
C.9.2        When an inmate is transferred to segregation, health care personnel are informed immediately and provide assessment and review as indicated by the protocols established by the health authority.
C.9.6        The status of inmates in administrative segregation and protective custody is reviewed every seven (7) days for the first two (2) months and at least every 30 days thereafter.
C.9.9        Continuous confinement for more than 30 days requires the review and approval of the Facility Administrator or designee.
C.9.12       All special management inmates are personally observed by a Correctional Officer twice per hour, but no more than 40 minutes apart, on an irregular schedule. Inmates who are violent or with Mental disorders or who demonstrate unusual or bizarre behavior receive more frequent observation; suicidal inmates are under continuing or continuous observation.
C.9.15       Staff operating special management units maintain a permanent Log that contains at a minimum the following information for each inmate admitted to segregation:
Name
Number
Housing location
Date admitted
Type of infraction or reason for admission
Tentative release date (from Special Housing Unit)  .
Special Medical or psychiatric problems or needs
List of officials who inspect the units, counsels the inmate on his or her behavior, and other visitors
C.9.21       Inmates in special management units can write and receive letters on the same basis as inmates in the general population.
C.9.25       Inmates in special management units receive a minimum of one (1) hour of exercise per day outside their cells, five (5) times per week, unless security or safety considerations dictate otherwise.

RESTRICTED DOCUMENT

**Detainee Transportation:**                                     **Non-Compliant**

C.10.1      Detainee transportation vehicles receive an annual safety inspection by qualified personnel.
C.10.2      Transportation vehicles are secured when not in use.
C.10.11     Detainees are searched prior to boarding a vehicle.
C.10.14     Transport vehicles are searched for contraband prior to and after every Detainee movement.

## 4. Food Service:                                         Deficient

A review of the Food Service Department is based on staff and detainee interviews, Food Service Policies and Procedures, and direct observation of operations.

The Food Service Department is operated by a contract company, Aramark, Inc. According to the stated contract with Dona Ana County Detention Center, the staff quota is three (3) contract employees per shift. There are two (2) shifts, A.M. and P.M. with a total of six (6) contract staff per day. To accomplish this, Aramark has the following positions in the food service department; one (1) Food Service Director (FSD), one (1) Assistant Food Service Manager (AFSM) and nine (9) Kitchen Supervisors. An average of 20 kitchen detail detainee workers are assigned by the Classification Department to work in the kitchen. Officers in the Classification Department are responsible for reviewing the pre-assignment Medical examination and other classification documentation prior to assignment to Food Service. An Officer is assigned to the kitchen when Detainee Workers are present. All food cart deliveries and tray issuance are performed by Officers.

Policies, Procedures and Cleaning Schedules are posted throughout the Food Service Department. Daily sanitation inspections are not being conducted. There is no file containing any daily or weekly inspection Check Lists including comments on the inspection and corrective action taken. The AFSM presented a weekly walk-through document but stated it was used as a guide and was specifically for equipment operation inspection and not a sanitation inspection. Observation of cleaning and sanitizing reveals all areas, including food preparation, storage and dish machine areas are kept clean, and organized with the exception of the chemical storage area and detainee breakroom. The sanitation level of all equipment was noted as acceptable with additional detailed cleaning needed. The tiled floor in the Food Service area was observed to need re-grouting. The lack of grout has resulted in areas of stagnant water between tiles. These areas cannot be properly cleaned. The New Mexico Environmental Department conducted an inspection on March 3, 2015.  The findings on the Food Safety Report indicate basic sanitation requirements are being met with minor discrepancies noted. There was no documentation that corrective action was taken to correct discrepancies noted on the Report.

There is no staff training and development program in place for the Kitchen Supervisors. The FSD and AFSM receive training from Aramark Company. There is no documentation of detainee training for food service equipment with the exception of the slicing machine. User Manuals for proper equipment use and maintenance were non-existent during the initial walk through inspections. Copies of these Manuals were made and brought to the kitchen office prior to the completion of the NAR.  A daily

visual inspection of the detainees' general health is conducted. Observation of Food Service workers reveal all detainee workers were wearing hair coverings, beard guards, and using disposable gloves while handling food products. Detainees were attired in appropriate protective clothing (disposable aprons) but were not wearing safety shoes with toe protection. All personnel, to include staff, should be wearing safety shoes in the Food Service Department.

A review of the Medical Files of all Food Service Detainee Workers revealed 15 out of 20 detainees had no documentation of a pre-assignment examination in their Medical Files. A Binder with copies of pre-assignment examination documents is in the Food Service Department, however, that Binder was missing along with two (2) of the 20 detainee Medical Clearance Forms. The missing two (2) Forms were located in the Classification Department.  Detainee Pre-assignment Examination Forms should be stored in their Medical Records.

There were no deliveries of perishable food items during the NAR.  An interview with the FSD and AFSM revealed temperatures are taken upon receipt of perishable items. Observation of the dry storage room, refrigerated and freezer areas revealed proper storage and labeling of food items is consistently followed. During the NAR, all food code temperatures were maintained for the refrigerated areas, however, the freezer temperatures were not being maintained properly. A review of the Temperature Logs indicated that this has been a problem for at least 3 months.

The dishwashing machine and manual pot and pan washing processes were observed. A single tank dish machine is used to wash and sanitize all food service trays. The dish machine uses hot water to sanitize the food trays and service-ware. Required water temperatures are not being met. The wash temperature was 20 degrees below required minimum temperature and the final rinse is currently inoperable. An attempt to sanitize the food trays has been undertaken by supplying a chlorine sanitizing solution to the final rinse. The dish washing machine is not manufactured to utilize this chemical which is corrosive to metal and highly reactive with the de-liming solution used periodically on the machine. Lime build up inside the dish washing machine is excessive. This machine needs to be repaired or replaced. The manual pot and pan washing process utilizes a chemical quaternary ammonia sanitizer. Water temperature readings for the pot and pan sink were Non-Compliant with code and the chemical manufacturer's recommendations. The current pot and pan washing system is designed to fill both wash and final rinse tanks utilizing chemical dispensing equipment.  The wash sink dispensing system requires hot water. The final rinse sink dispensing system requires cold water (60 – 70 degrees F.). Hot water (130 degrees F.) was plumbed to the final rinse sink dispenser, nullifying the disinfectant properties of the sanitizing solution. Inmates were observed using hot tap water from the spigot and adding the soap from an unsecured chemical bucket into the wash sink at their discretion. None of the chemicals for both the dish washing machine and manual pot and pan sink area were secured. Three of these chemicals are corrosive and can cause severe burns to exposed areas of the body. Chemical control is haphazard at best with inventories conducted only once (1) per week. A contract Food Service Supervisor was not aware if a chemical inventory existed. A chemical accountability system needs to be established and all hazardous and corrosive chemicals need to be secured at all times. Access to the chemical room should be limited to one (1) staff member for accountability purposes.

Pots/pans and food trays are not being properly dried and stacked wet for storage prior to use. There are not enough drying racks to properly dry food trays after washing. The racks currently in use are designed for food storage and are not slotted to allow proper drainage and air drying.  Many food trays

are cracked, chipped, stained from food products and crusted with chemical residue. Almost all food trays are in need of replacement.

All meal service is conducted via satellite method to the individual Pods to include Medical Observation and Segregation Units. Trays are covered and stacked on open carts and delivered by Officers. Tray make-up, meal service and sanitation were observed. Tray make-up was performed within guidelines. All food items were at proper temperature and portions were within the stated quantities of the approved menu. The heating elements of the serving line are currently inoperable. Food in pans had to be heated on the stove top and quickly trayed before cooling could occur. This serving line needs to be repaired or replaced so proper temperatures can be maintained. During meal transportation and service it was observed that Officers delivering trays to the detainees within each unit handled uncovered trays without proper hair restraints. Not all Officers in the kitchen were wearing hair restraints properly. Additionally, Special Diet trays are labeled with specific detainee names and register numbers. This allows detainees working in Food Service to know exactly who will be eating what tray. This is a potential contraband and security issue as these detainees can successfully place prohibited items in the food to specific detainees. Labeling tray type only and providing the Correctional Officers an Accountability Sheet would alleviate this security issue. Detainees interviewed stated the food served was good and wholesome.

This facility has a four (4) week cycle menu. The mainline menus are developed by Aramark, Inc. along with corresponding recipes. A nutritional analysis was performed and certified by a Registered Dietitian. There is no documentation for substituted items served. A Record of Actual Meals Served needs to be maintained.

The Food Service Manager follows the four (4) cycle menu and relies on company guidelines for substitutions. Specific weekly as-served menus are not retained. There is no religious diet menu, or approved recipes for religious diets. Therefore, religious diets are not reviewed by a Registered Dietitian as required. During the NAR there was one detainee approved for a religious diet by the facility Chaplain. Regular, non-religious foods from the main menu were placed in foam hinged containers and sent to the detainee on the Religious Diet List. These foods do not meet the qualifications for a religious diet. There is no approved area (segregated from regular meal production) in the kitchen for properly preparing religious diets. Certified religious pre-made trays are not purchased. The contract food service company should purchase "certified" religious diet food trays for detainees on the Religious Diet List.

Commissary operations were observed during the NAR. Dona Ana County Detention Center provides four (4) options for detainees to acquire commissary products.

(1) "Regular Orders" - Kiosk machines are located in each unit. Inmates place commissary orders via the kiosk. These orders are printed off in the commissary, filled, and placed in clear plastic bags. The orders are delivered once a week, on Mondays and Tuesdays. Commissary Contract staff deliver commissary to detainees, un-escorted, via large mobile bins. The Contract staff is provided facility keys for the Pod door slot. At the time of delivery, detainees line up at the Pod door and Commissary Contract Staff remove all food items from the clear plastic bags, accounting for all items along with the detainee, and the food items are handed to them through the Pod slot. The detainees were observed placing these items in soiled laundry bags. This practice presents sanitation concerns since detainees are placing food in a bag that holds soiled laundry.

(2) "Pick and Pack"- The unescorted Commissary Contract staff perform security duties, when delivering commissary. Detainees line up at the door and Commissary Contract staff utilizing facility keys open the Pod door slot. The detainee hands the Commissary staff member their detainee ID card and the Commissary contract staff allows the detainees to choose items off the rolling cart. The staff is equipped with a hand-held order scanning device that scans each item, charges the inmate's account, and reveals the detainees' balance. The items are handed through the door slot to the detainee. Again, detainees were observed placing these items in their laundry bag.

(3) "Fresh favors" - Detainees are allowed to order fresh, hot foods from the Commissary via the unit kiosk. These are delivered to the Pods on Tuesdays, Thursdays, and Fridays.

(4) "I-care" - The family members of detainees can order food for detainees by accessing the Aramark Company's 'I-Care' web site at www.icarearamark.com. Items are delivered, Monday through Friday, to the detainee Pods. Detainees have weekly dollar limitations on commissary purchases. These limitations vary depending on security levels of the detainees and disciplinary sanctions. The amounts are as follows: Minimum Security - $120.00, Medium Security - $90.00, Maximum Security - $60.00, Special Management – personal hygiene only. During a tour of several Pods, there was an excessive amount of clutter in the detainee cells due to two factors: the amount of commissary items allowed to be purchased and lack of storage place and/or facility issued personal property storage bins. Many detainees did not have facility issued personal property storage bins to place these items under their bunks. Detainees were stockpiling purchased food bowls, personal hygiene items and toilet paper tubes. Observation in the Pods revealed toilet paper tubes were being used to place into their cell door locks disabling them as inoperable. The excess items in the cells are contributing factors to contraband and poor sanitation conditions in the Pods.

**Food Service Administration:**                           **Non-Compliant**

D.1.2     The Food Service Administrator or designee conducts daily inspections of all food service areas, including dining and food preparation areas and equipment.
D.1.3     The facilities food service operation is reviewed by an independent, outside source to ensure that food service facilities and equipment meet established governmental health and safety codes. Corrective action is documented for all deficiencies.
D.1.5     All staff, contractor, and volunteer Detainee workers who work in the food service department are trained in the use of food service equipment and in the safety procedures to be followed in the food service department.

**Food Storage and Preparation:**                          **Non-Compliant**

D.3.2     Food is stored in a manner compliant with U.S. or State Food Codes.
D.3.3     Food is protected from contamination from equipment, utensils, and linens in a manner compliant with U.S. or State Food Code.

**Equipment, Utensils, and Linen:**                        **Non-Compliant**

D.4.2    Ware washing (dishwashing) machines are operating within designed specifications and/or in a manner compliant with U.S. or State Food Code.

D.4.3    Manual ware washing operations utilize at least 3 sufficiently sized compartments for manually washing, rinsing, and sanitizing equipment and utensils; and are compliant with U.S. or State Food Code.

D.4.4    If hot water is used for sanitization in manual ware washing operations, the sanitizing compartment of the sink shall be compliant with U.S. or State Food Code.

D.4.5    Drain boards, utensil racks, or tables large enough to accommodate all soiled and cleaned items that may accumulate during hours of operation shall be provided for necessary utensil holding before cleaning and after sanitizing.

D.4.9    Food service equipment shall be cleaned, maintained in good repair and in a manner compliant with U.S. or State Food Code.

D.4.10   Food service equipment shall be used in accordance with the manufacturer's operating instructions and in a manner compliant with U.S. or State Food Code.

D.4.11   Cleaning agents are used in accordance with the manufacturer's label instructions.

D.4.12   In manual ware washing operations, the wash, rinse, and sanitizing solutions shall be maintained clean and temperatures maintained in accordance with the cleaning agent manufacturer's label instructions or as required by U.S. or State Food Code.

D.4.13   Equipment, Food-Contact Surfaces, Nonfood-Contact Surfaces, and Utensils shall be clean to sight and touch

D.4.14   The food-contact surfaces of cooking equipment and pans shall be kept free of encrusted grease deposits and other soil accumulations.

D.4.16   Equipment, food-contact surfaces, utensils, cooking equipment, baking equipment, non-food contact surfaces, and lines, shall be cleaned frequently with methods compliant with U.S. or State Food Code.

D.4.17   Clean and sanitized equipment and utensils are dried in accordance with U.S. or State Food Code.

**Detainee's Meals and Special Diets:**                           **Non-Compliant**

D.5.3    Accurate Records are maintained for all meals served.

D.5.4    Menu evaluations are conducted at least quarterly by Food Service Supervisory staff to verify adherence to the established basic daily servings.

D.5.9    Special diets are provided for inmates whose religious beliefs require the adherence to religious dietary laws when approved by the facility Chaplain.

D.5.10   Religious diets are reviewed by a registered or licensed dietitian for nutritional adequacy.

## 5. Safety and Sanitation                                      Acceptable

The review of the Sanitation program included the following: staff and detainee interviews, direct observation of all the facilities operations, and a review of all department procedures. The facilities Sanitation, Fire and Safety program is supervised by the Safety Sergeant. The Safety Sergeant received certification as a Fire Inspector I. The Facility falls under the State Fire Inspector Department and has all

evacuation plans approved. The inspection conducted in December, 2015 revealed no major deficiencies; however, they have not received the completed report as of this date. DACDC is protected by an automatic sprinkler system, smoke detectors, duct detectors, manual pull stations, and audible alarms. Fire evacuation signs were observed posted clearly throughout the facility. The Safety Sergeant performs monthly Fire/Safety Inspections, with the weekly Sanitation Inspections completed by the Unit Sergeants or Unit Managers. The Unit Managers or Unit Sergeants complete a Physical Plant Inspection Form with deficiencies noted and when corrective actions have been put in place.

During the NAR, observation and interviews with staff and detainees, concerns were voiced regarding the lack of detainee storage space and the use of plastic boat beds instead of being assigned to cell beds. There are a number of beds located in the Booking Area that are utilized for detainees pending placement. However, a large number of the beds are not being utilized and could be placed in various Pods. Some detainees were given clear plastic bins for storage of personal property to include food items, while others placed items under their boat bed mattress or utilized the small shelf area if they were assigned a cell.

Detainees are being issued one (1) mattress, one (1) mattress cover (no sheets, pillows, or pillow cases), blankets and two (2) sets of clothing weekly. Detainees are not issued underwear; the females are issued one sports bra. If they want underwear they can purchase it from the Commissary. Some are washing their underwear with hand soap as they only have one pair. Indigent packets are given out every two (2) weeks, which includes toothpaste, soap, and a cup, deodorant and a spoon.

There are Evacuation Signs posted throughout the facility with monthly fire evacuations being completed in different housing areas. The rear of the facility has a fenced area that is large enough to hold the facility's population, which includes the facility's recreation areas for the Pods. A Fire Drill of one detainee Pod was conducted. Facility staff evacuated the detainee population per facility policy and all detainees were account for. The Safety Sgt. conducts monthly inspections of the fire extinguishers, verifying by signature and date that they are within the code.

Generator Load tests are conducted and Eye Wash stations located in the Medical area are routinely check and filled as need by the Safety Sgt. Transport vehicles are furnished with wipes, extinguishers and a multi-use disinfectant cleaner.

Housekeeping plans are available in the Pods with cleaning and sanitation. Wet floor signs were not observed in the housing units, however, they were observed on the cleaning carts that contract staff are using throughout the facility. The detainee Pods are cleaned utilizing DMQ and the disinfectant maintained in the mop closet along with brooms and mops. The Pods are clean, however, the general areas of the facility that are the responsibility of the Contractor could use additional over-sight in thorough cleaning. Floors along the hallways have a buildup of dirt and other debris. This observation also includes staff and visitor restrooms as well as office areas. Vents were observed to have a build-up of dust and debris. It was noted that tiles were missing in some of the showers which makes it hard to sanitize these areas. Additionally, labels from containers were used on the shower heads by detainees to allow for the water to have a more consistent control. Lime and mineral deposits, inside and outside of the shower heads, need to be cleaned.

RESTRICTED DOCUMENT

The Barber Shop area is maintained well by the detainees.  Detainee interviews revealed they were aware of the correct procedures regarding methods of correctly sanitizing their tools.  The Barber Shop tools were observed to be clean with no build-up of oils or cosmetics observed.

The Facility has contracted with a Pest and Vermin Company.  Observation of the facility shows that there are no concerns.  The disposal of liquid, solid and hazardous waste materials comply with government regulation.  Detainees are trained per OSHA protocols/standards on hazardous clean up and acknowledge training by signature.  All hallways were observed to be free of obstacles allowing for immediate access or release of detainees in case of emergencies.

Observation of the Medical area revealed there are flammable cabinets to house flammable materials and facility policy Emergency Preparedness and Response Fire Safety, states 'all flammable liquid and materials shall be stored outside of the main facility'.   Additionally, the facility is not consistently dating and identifying these materials.

The Food Service area was clean and free of debris. Detainees assigned to Food Service wear facility issued jumpsuits, food serve approved aprons, hair and beard covering.

It was observed in the Laundry area that laundry carts were assembled along the wall.  This is an entrance and exit area. While the carts do still allow for approximately 48 inches of egress in and out of the area, special attention is needed to ensure carts do not block the egress area.

Observation of electrical boxes throughout the facility revealed there are discrepancies regarding locking and tagging. Additionally, a review of the Maintenance Department along with the Warehouse indicate inventories of their chemicals have discrepancies when leaving those areas.


**Fire Safety and Chemical Control:**                                    **Non-Compliant**

F.1.13          Flammable, toxic, and caustic materials and chemicals are maintained in accordance with
                OSHA regulations (4-ALDF-1C-11), and:
F.1.13A         Flammable, toxic, and caustic materials are inaccessible to Detainees.
F.1.13.B        Flammable, toxic, and caustic materials are inventoried.


**Sanitation and Environmental Control:**                               **Non-Compliant**

F.2.11          Detainee sleeping surfaces and mattresses are 12 inches off the floor.
                4-ALDF-1A-11
F.2.12          Detainees are provided a place to store clothes and personal belongings.
                4-ALDF-1A-11

Global Corrections Group
Needs Assessment Review (NAR)

RESTRICTED DOCUMENT

**Clothing and Bedding:**                                                    **Non-Compliant**

F.3.1       All Detainees are issued clean, temperature- appropriate facility clothing during processing. 4-ALDF-4B-03

F.3.2       Detainees are issued clean well-maintained clothing items in a sufficient quantity of each item, or provided an opportunity to exchange, or laundered each item on a weekly equivalent basis.

    a.       Two outer garments (two shirts & pants or two jumpsuits)
    b.       Seven pairs of underwear
    c.       Seven pairs of socks

F.3.3       Detainees are issued one pair of facility footwear.

F.3.4       Detainees are issued clean linens and towels in the following quantities and are provided for the opportunity to exchange or have laundered these items each week:

    a.       Two sheets
    b.       One pillowcase
    c.       One towel

## 6. Service and Programs                                                      **Deficient**

The DACDC has a classification system that identifies minimum, medium, maximum and Special Management Security detainees. As per facility policy, Classification staff review criminal history, including prior violence, gang affiliation and pending charges. Medical staff review past and present Medical issues and Medical staff review and utilize a Medical Questionnaire that includes PREA questions. The Detainee is assigned a housing Pod, receives a Detainee Handbook and receives a work assignment (if applicable). All Detainees sign a Classification Interview Form stating they acknowledge they received an initial care package containing hygiene items and writing materials.

The Detainee Work Application Form is signed by the detainee acknowledging they have volunteered for the work assignment. All facility workers receive $3.00 a day. Interviews with staff revealed Federal female detainees are allowed to work in the facility, however, Federal male detainees are not allowed to work. There is no Policy or Procedure that describes detainee jobs and a review of detainees' files, in the Disposition Room, indicates the filing of the Detainee Work Applications or Medical Clearances are not filed per facility policy.

Interviews with detainees revealed DACDC does not have a designated area in the facility for a Leisure or Law Library. Detainees, through a Form, request specific books to read and a rolling cart delivers the books to each detainee in their respective Pod. The DACDC's Detainee Library is located in the warehouse. An observation of the Warehouse Library displayed a poorly stocked library and books in poor condition. Therefore, the facility is not able to comply with facility policy regarding the number of books allowed per detainee. The Law Library consists of one (1) New Mexico State Law Code book and no Federal Law Code books. The number of Law Library books does not meet the needs of the Detainee population or the FPBDS. An Interview with Contract Library staff expressed their concern

that resources are lacking that would allow participation in book fairs and other venues and to obtain paperback books is nearly impossible.   Staff state they receive book donations.   However, those resources are drained after receiving books a couple of times a year.

Interviews with General Population detainees indicated they are not offered access to outside recreation for a minimum of one (1) hour per day, seven (7) days a week.   A review of facility policy revealed there is no reference to recreation time or clothing attire and how it is distributed. Interviews with Pod staff indicate there is inconsistency in what is offered.

Detainees are authorized to correspond with Attorneys, State/County Court, Executive and Legislative Branch Officials through Special mail.   Policy authorizes detainees to correspond with family friends and other significant community contacts.

DACDC has a visiting policy, however, it does not provide guidance to the Officers regarding conditions under which visits may be denied or visitors are searched.   In addition, these conditions are not defined in writing in the Detainee Handbook or in the Visitors' Area.

**Access to the Courts:**                                                **Non-Compliant**

| | |
|---|---|
| G.2.1 | The right of prisoners to access to courts is ensured. |
| G.2.2 | Detainees have access to a law library, if there is not adequate free legal assistance to assist them with criminal, civil, and administrative legal matters.   Detainees have access to legal materials to facilitate the preparation of documents.  4-ALDF-6A-03 |

**Recreation:**                                                         **Non-Compliant**

| | |
|---|---|
| G.6.2 | Detainees have opportunities to participate in leisure-time activities outside their respective cell or living room on a daily basis.  4-ALDF-5C-02 |

**Visitation:**                                                         **Non-Compliant**

| | |
|---|---|
| G.7.3 | There is a written visitation schedule and hours for general visitation. The visitation schedule is available to the public. |
| G.7.5 | Conditions under which visits may be denied are defined in writing. 2-ALDF-5B-02 |

## 7.  Prison Rape Elimination Act (PREA)                              Deficient

In September of 2003, the Prison Rape Elimination Act was signed into law and became the first federal law to address the sexual abuse and harassment of incarcerated individuals.   The law mandates that states adopt a "Zero Tolerance" for all forms of offender sexual abuse and harassment and that each

State make prevention of offender sexual abuse and harassment a top priority. Below are the findings of DACDC in meeting those standards.

The PREA Compliance Manager is one of three facility Captains.  While he reports directly to the Acting Facility Director, he wears multiple hats in addition to PREA Manager. The Captain's additional duties include oversight of Training, Medical/Mental Health, Federal Male Pod, Maximum Security Male Pod, Disciplinary Segregation Male Pod, and Medium Security Male Pods.  During an interview with the PREA Compliance Manager he revealed that he is, "… able to devote at best, five percent of [his] work time to PREA."  Generally, the PREA Compliance Manager becomes involved with PREA as the result of a PREA allegation and subsequent interviews.  He is not able to exercise quality control over the program in any meaningful manner. Given the critical importance and expectation of these duties, he cannot perform them in an acceptable manner.

None of the Memoranda of Understanding (MOUs ) reflect verbiage regarding 'receiving facilities' being required to adopt and comply with PREA standards.  Even in short term cases, PREA compliance must be required in these MOUs.

## Standard 115.13:                                                   **Non-Compliant**

Pursuant to staff interviews, the only facility Staffing Plan is in the possession of the Director who is not available at the facility.  Accordingly, there is no evidence to substantiate the fact that a Staffing Plan is or was developed with PREA considerations in mind.  Additionally, there is no evidence to substantiate that the Staffing Plan is or has been updated on an annual basis.

Observation of Housing Pods revealed no Officers were assigned to Pods A and B.  There is one camera located at the front of the unit and there is no bathroom shower/toilet visibility as the result of camera placement.  The camera is monitored from the Master Control Center.  The bathroom is a blind spot with only one camera.

## Standard 115.14:                                                   **Non-Compliant**

The housing of juvenile offenders at DACDC has been identified as temporary and scheduled to be terminated in May, 2016.  It was noted that male and female juveniles are currently housed at DACDC. While facility staff have performed in an exceptional manner to ensure sight, sound and physical separation from adult offenders, there was no policy reflecting these procedures.

## Standard 115.15:                                                   **Non-Compliant**

Pursuant to observations, it was determined that the Intake Area, A through F Pods and X Pod, present concerns in terms of detainees being able to perform bodily functions and change clothing without non-medical staff of the opposite gender viewing their breasts, buttocks, or genitalia.  Such viewing can occur in exigent circumstances or when such viewing is incidental to routine cell checks.  Specifically,

RESTRICTED DOCUMENT

the showers are exposed to staff line of sight and the amount of glass in each cell serves as a vehicle for viewing while inmates are on the toilet.  At the present time, there is no mechanism for many male detainees (dependent upon unit layout and physical features) to shield genitalia and buttocks subsequent to using the toilet or during dressing. None of the showers in these areas are equipped with shower curtains (clear at the feet and above the shoulders) and or portable privacy screens.

It was observed that many of the cell doors and cell fronts are configured with substantial glass and there are no barriers in the cells to ensure the requisite privacy previously described.  This may be problematic in terms of the potential for or actual staff voyeurism.

Pod Officers announce entry prior to a male staff entering the female pods.  However, no such announcement is made prior to female staff entering into the male pods. Interviews, conducted with staff reveals this is common practice.

**Standard 115.16:**                                              **Non-Compliant**

Review of facility policies indicate there is no evidence of specific procedures intended to ensure that disabled detainees receive equal opportunity to participate in or benefit from all aspects of the agency's efforts to detect and respond to sexual abuse and sexual harassment.  Similarly, procedures are not articulated as to education of those detainees who have limited English proficiency regarding sexual abuse and sexual harassment.

**Standard 115.17:**                                              **Non-Compliant**

County and DACDC policies address parts of this standard.  However, there is a need for clarification with respect to Dona Ana County Policies and Procedures, Section III, entitled Employment Process.  Specifically, the term 'moral turpitude' is used in the context of record of conviction that is disqualifying in terms of County employment.  While 'moral turpitude' may include some of the disqualifying crimes and behaviors required by the Standard (e.g., "Has engaged in sexual abuse in a prison/jail/lockup/community confinement facility/or other institution as defined in 42 USC 1997; has been convicted of engaging or attempting to engage in sexual activity in the community facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent.") The term 'moral turpitude' is broad and requires clarification.

Interviews with facility staff revealed applicants for promotion are not questioned regarding the existence of sexual abuse in a prison/jail/lockup/confinement facility or if they have been convicted of engaging or attempting to engage in sexual activity in the community by force, overt or implied threats of force, or coercion, or if the victim did not consent or was unable to consent or refuse; has been civilly or administratively adjudicated to have engaged in the activity described in the preceding sentence or document indicating acknowledgement of their response. Additionally, there are no policy provisions or actual practices regarding the requisite requirement for a criminal background check at each five (5) year service interval for current employees and contractors who have contact with detainees.

**Standard 115.21:**                                            **Non-Compliant**

Staff interviews revealed investigative protocol utilized at DACDC is not adapted from the Department Of Justice Office Violence Against Women publication. Additionally, as cited in the discussion for Standard 115.53, it has been determined that there are no MOUs or other agreements with community service providers that are able to provide inmates with emotional support services related to sexual abuse. It is noted that facility staff are presently working on these MOUs.

Corizon Mental Health staff state they provide emotional support for detainees subjected to sexual abuse. A review of the training curriculum revealed they receive appropriate training as crisis providers.

**Standard 115.31:**                                            **Non-Compliant**

Overall, the Training Program, as related to PREA standards, is geared towards juveniles and not the adult detainee population. As reported by Training Staff, the County's Group is in the process of revising the training slides to encompass DACDC's adult population. During review of the training slides, it was noted it lacked information as to how and to whom staff report information related to sexual abuse and sexual harassment.

**Standard 115.32:**                                            **Non-Compliant**

A limited review of training records revealed DACDC staff and volunteers were PREA trained during the last 12 months. However, there were gaps in terms of PREA training for the numerous contractors employed at the facility.

**Standard 115.33:**                                            **Non-Compliant**

A review of the Facility's process (i.e. reading materials, television screen) to educate detainees regarding PREA does not meet the needs for detainees who present low intellectual functioning, various cognitive disorders, or who are deaf, blind or visually impaired.

**Standard 115.34:**                                            **Non-Compliant**

Administrative PREA investigations are conducted minimally by 10 Unit Managers employed at DACDC. Two (2) of the 10 Unit Managers are trained regarding the conduct of sexual abuse investigations in a confined setting. However, when reviewing the lesson plan, there is no discussion regarding interviewing techniques for detainees subjected to sexual abuse, etc. The PREA Coordinator/Manager has been trained regarding the conduct of PREA investigations. However, the lesson plan was not available for review. Therefore, compliance with this training could not be determined.

Supervisory Correctional staff also receive training regarding chain of evidence, preserving the crime scene, and gathering evidence following the PREA training provided to all staff. This training does not

meet the requirements regarding interviewing sexual abuse victims and issuance of Miranda/Garrity warnings.

**Standard 115.41:**                                                              **Non-Compliant**

The initial PREA screening is accomplished by Corizon Medical staff. This screening tool is comprised of two questioned areas: History of Victimization and History of Sex Offenses. This does not meet the requirement for utilization of an objective screening instrument. There are no other questions from which correctional decisions and needs can be assessed.

Facility Policy 2A-29 entitled 'Sexual Assault' is silent regarding re-assessment time frames as related to risk of victimization or abusiveness. There is no policy verbiage reflecting that detainees are not disciplined for refusing to answer (or for not disclosing complete information) related to the following: Whether or not the detainee has a mental, physical, or developmental disability; whether or not the detainee is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender non-conforming; whether or not the detainee has previously experienced sexual victimization and the inmate's own perception of vulnerability. In addition, Policy does not address the 90 day response requirement and extensions, documentation of the detainee's declination to utilize third-party assistance to file an administrative remedy, and the 48 hour response requirement for emergency grievances.

**Standard 115.53:**                                                              **Non-Compliant**

Pursuant to staff interviews, it has been determined detainees are not informed, prior to being granted access to outside support services, of the mandatory reporting rules governing privacy, confidentiality, and/or privilege that applies to disclosures of sexual abuse made to outside victim advocates, including any limits to confidentiality under relevant Federal, State, or local law. Additionally, there are no MOUs or other agreements with community service providers who are able to provide detainees with emotional support services related to sexual abuse. It is noted that facility staff are presently working on these MOUs.

**Standard 115.54:**                                                              **Non-Compliant**

Interviews and observation determined formal procedures for receipt of third-party reports of detainee sexual abuse and sexual harassment are not in place. There are no postings of such procedures in the Front Lobby. There are also no pamphlets or documents describing such procedures.

**Standard 115.61:**                                                              **Non-Compliant**

Staff interviews revealed Facility Policy does not require all staff to immediately report any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

**Standard 115.65:**                                                              **Non-Compliant**

A specific written Institutional Plan, identifying chronological steps to be facilitated by key players in response to a sexual abuse incident, has not been completed.

**Standard 115:67:**                                                    **Non-Compliant**

Staff interviews reflect staff members are not designated to monitor possible retaliation against sexual abuse/sexual harassment victims and staff who report the same.

**Standard 115.82:**                                                    **Non-Compliant**

Per staff interviews, Public Health Service staff provided timely information and access to emergency contraception and sexually transmitted infections prophylaxis until December 31, 2015.

**Standard 115.89:**                                                    **Non-Compliant**

Policy review and staff interviews reveal there are no procedures regarding secure storage of incident-based and aggregate sexual abuse dates.  Additionally, the ten (10) year requirement for retention of sexual abuse data is not specifically articulated in the policy.

## EXCEEDING EXPECTATIONS

Global Corrections Group, LLC is committed to delivering the highest quality services, meeting the needs and expectations of each and every client. It is the mission and culture of the Global Corrections Group to provide the highest quality of technical assistance to local, state and federal detention facilities to achieve total compliance, meeting all requirements and federal mandates, for the lawful and compliant confinement of federal prisoners.

KHAN, ERIK #1312105
1650   Copper Loop
LAS
Cruces, NM 88005

Khan v. Barela  15-cv-1151)

Clerk of the Court
US DISTRICT COURT
100 N. CHURCH ST
LAS CRUCES, NM 88005

RECEIVED
U.S. DISTRICT COURT
LAS CRUCES, NEW MEXICO

JUN 27 2016

MATTHEW J. DYKMAN
CLERK