Exhibit  C

Memorandum  +  Declaration

Comparative  Analysis  of  NAR

*Memorandum + Declaration*

To: • Dona Ana County Government          • US Marshal Service
    • Julia Brown, ESQ.                   • Global Corrections Group
    • Peter Goodman, ESQ                  ▪ (Emery Morris, COO)
    • Nelson Goodin, ESQ                  ▪ (Danieray Johnson, V.P.)
    • Bill McCamley                       ▪ (Marsha Hardeman, J.D.)

From: Erik Khan (Detainee)

Date: June 15, 2016

Subject: Comparative Analysis of NAR by Global Corrections

## I.   Introduction

On or about February 8-12, 2016 Global Corrections Group, LLC performed an inspection at the request of the Dona Ana County Government at a price not to exceed $50,000. At the conclusion of the inspection, Global produced a report called a "Needs Assessment Review" which outlined 7 categories of general areas at the facility. Because the report fails to identify egregious errors everpresent at the facility, misrepresents certain aspects reported, and otherwise contains false information, this memorandum is being provided in an effort to complete the picture. ERIK KHAN offers the following information under the penalty of perjury pursuant to 28 USC 1746.

<u>II. Author's Experience</u>

Erik Khan has been continually confined at Dona Ana County Detention Center ("DACDC") since May 9, 2012. With the exception of a brief hiatus in late 2013, this continued confinement has resulted in over 30,000 hours of experience inside DACDC. Thus, all claims made herein are made pursuant to direct observation, personal experience, and personal interviews with other inmates and staff.

Furthermore, prior to his incarceration, Mr. Khan was a leading medical practice consultant and was Board Certified by the American College of Medical Practice Executives. Mr. Khan accelerated through the ranks of medical business having recieved training (and extensive experience) in: Emergency Medical Response, PATIENT CARE SYSTEMS, CPR/FIRST AID Instructor, Surgical Technology, Ultrasound Technology, Pharmacology, Medical Provider qualifications and so on. Finally, Mr. Khan is a veteran of the United States Marine Corps with experience in: Military Police, Civil and Criminal Law, Non-lethal weapons, lethal weapons, continuum of force, use of force, prisoner rights (military/civilian) and criminal investigations.

Thus, Mr. Khan is in a rare position to offer a comprehensive analysis of the issues presented in the Review.

## III. Pending Litigation

Me Khan is currently engaged in two lawsuits that involve Dona Ana County and DACDC. These will be referenced throughout this memorandum.

1. KHAN v. BARELA, et. al ("Barela Suit")

   15-CV-1151-MV-SMV

   Federal Court / Dist. of New Mexico

2. KHAN v. GETZ, et. al ("Getz Suit")

   D-307-CV-2016-1161

   State Court / Third Judicial District

## IV. Global Corrections Group

Dona Ana County entered into an agreement with Global Corrections Group, LLC (Dona Ana County Contract for Goods and Services, Contract # 16-135, (Hereinafter: "Contract")) The agreement promised no more than $50,000 (Contract, Sec I at 1) for a "Phase 1" "Facility Needs/Risk Assessment." (Contract, Sec II at 2). A final report was provided on February 29, 2016 and is entitled: "Facility Needs Assessment Review (NAR) for the Dona Ana County Commission (hereinafter: "Report").

The Report covers seven general topics of life at DACDC: administration/management; health/mental/dental; security/control; food service; safety/sanitation; services and programs; prison rape elimination act. (Report at 3). Confusingly, the Contract seems to promise a comprehensive review of Suicide Prevention (Contract, Sec II at 3, para 7) but that was not provided.

Global Corrections Group promised to deliver "a comprehensive review of operational procedures, physical plant opportunities, State and Federal standards for jail and detention operations" (Id. at 2). Global Corrections Group failed to properly inspect and report deficiencies as promised in the agreement. As a result the County should demand a refund or a follow-up review addressing all concerns.

V. Objections and Clarifications to the Report.

This section will discuss objections to the report's findings and also provide clarifications to false or misrepresented information.

A. Administration and Management (Report at 3-6)

While the Report accurately reflects the DACDC is

overall deficient with this category, it fails to mention numerous vague and unconstitutional policies. Of immediate concern are policy issues that prevent:

- Contact/Private ATTORNEY Visits are wholly unavailable
- Detainee handbook prevents detainees from sitting on "toilets" and "beds" without qualification (Handbook, para 24(D)(13))
- Strip Search Policy targets persons who invoke their right to jury trial only
- Policy permits officers to prevent moving inmates from cells where they are having problems and told to "deal with it"
- Group punishments are routinely cast (i.e. a single inmate fails to turn in a coke bottle, T.V. goes off for all persons in the pod).

The claim that "[a]ssistance bars [] for disabled persons were observed in the Pod shower areas" is misleading, if not completely false. In the Pods Mr Khan has lived in (Booking, X-6, D-3, D-1) none of the showers have any disability accessible devices. During conversation with veteran officers, Mr Khan has been led to believe only medical pod has any assistive devices for showering. While it is true "there are cells in each Pod that are accessible to disabled persons" the report fails to mention that disabled persons are not necessarily

assigned to those cells. Indeed, in D-3, as of June 10, 2016, the two persons who use assistive mobility devices (cane and walker) are not assigned to the handicap accessible cell.

## B. Health, Mental and Dental (Report at 6-10)

It is astonishing that Global Corrections Group scored this category as "acceptable" and then noted 5 areas of non-compliance. In all events, the Report is very misleading. The following is a **non**-exhaustive list of issues with medical care at DACDC:

1. Nurses do not follow C-Spine Protocols for trauma
2. Nurses do not follow any flow system for determining acute/urgent medical issues.
3. Officers must call to ask if urgent visit is allowed and are routinely denied.
4. Sick-calls are managed by untrained LPN's; not RN's as the report declared
5. While Sick Call requests are answered, "appointments" take weeks. Sickness is gone before visit.
6. Dental offers extraction services only
7. No dental floss provided or purchaseable
8. Not enough OTC medications are available for purchase.
9. Sick Call nurses are rude and often belligerent

to detainees.

10. Nurses have the power to discipline detainees.

11. Mental health is very hard to get in to.
Mr. Khan begged for 17 months (see: Barela Suit)

12. The "crash cart" is **not** stocked properly and response nurses have no idea what to do in medical emergencies.

13. Ambulances are hardly ever called despite severe injuries (see incidents involving: Jorge Ambriz, and Ezekial Verdugo)

14. The list keeps going.

The report falsely claims:

The sick call requests are triaged seven (7) days per week by an RN. Sick call is scheduled within 24 hours of the reciept of the request.

"Triage" is a specific medical term and can only be conducted by interview and initial assessment. Triage cannot reasonably occur through a kiosk written by lay persons. Thus, NO TRIAGE OCCURS. Furthermore, "RN" nurses do not necessarily review any requests. In fact, unsupervised LPN nurses conduct greater than 90% of the medical care of detainees.

C. Security and Control (Report at 11-17)

A topic of concern, but omitted by Global Corrections Group, is: "Detainee Discipline" This area is indeed cause for litigation (see: Getz Suit). DACDC permits regular officers and even Cadets in training to accuse, adjudicate, impose punishment, and execute the punishment without notice or oversight. This policy clearly violates the U.S. Constitution's guarantee to procedural due process (see Wolff v. McDonnell, 418 U.S. 539, 563-566 (1974) (requiring prisons to have procedural due process protections before imposing any institutional punishment). Further, more serious offenses always require inmates to be confined to quarters while adjudication is pending, creating a de facto penalty regardless of what the offense is. Thus Wolff is always violated.

D. FOOD SERVICE (Report at 17-21)

While the report accurately determines the food service (provided by Aramark) is "deficient", it fails to discuss the nutritional adequacy of the food provided. The food at DACDC is horrible and commonly uneaten by detainees. The menu sounds great, but does not reflect reality: fresh cookies are in fact store bought duplex cookies, meal portions are not evenly distributed,

meals are starch heavy and protein poor, meals are constantly overcooked/burned or undercooked/cold, butter is used to fill calories, nothing is healthy about the meals, there are no substitutes, Medical diets are commonly not followed, dishes are cold by service time, and milk is only provided three times weekly. Given the County is paying about $1.15 per tray and there is an average inmate population of 700, the food should be much better. (Aramark has breeched its Contract).

Commissary is also discussed in this section. Global failed to note the Commissary does <u>not</u> offer any <u>healthy</u> food alternatives nor religious food items nor religious devices (Prayer rugs, Yamulke, Kufi, Rosary, Crosses, etc.). Further, the Commissary pricing is very expensive (ie. $0.69 for two tylenol pills; $5.79 for deodorant; $2.29 per soda bottle).

E. <u>Safety and Sanitation (Report at 21-24)</u>

There are several false statements made in this section of the report:

- "... blankets and two (2) sets of clothing weekly"

- "Indigent packets are given out every two (2) weeks, which includes toothpaste, soap, and a cup, deodorant and a spoon"

- "There are Evacuation Signs posted throughout the facility with monthy fire evacuations being completed in different housing areas"

- "The Barber Shop area is maintained well by detainees. Detainee interviews revealed they were aware of the correct procedures regarding methods of correctly Sanitizing their tools"

- "The detainee pods are cleaned utilizing DMQ and the disinfectant maintained in the mop closet..."

These statements are false because:

- Only 1 jumpsuit uniform is issued and offerred for exchange twice per week except for Aramark holidays

- Only one blanket is issued and offerred

a clean exchange once every other month
(6 times per year)

- Indigent packets do **not** contain deodorant, cup, or spoon. No free deodorant is ever given to detainees. The cup/spoon issued at intake is never cleaned or sterilized.

- Living Pods do not have evacuation signs inside them. Further fire drills have never brought anyone to a gated yard. They always go to Recreation yards in the dead center of the facility. (ie "West Rec")

- Barbers do not clean equipment between cuts. Mattress cover is used in lieu of barber cape and is always covered in numerous detainees': hair, blood, bodily fluids (mucus, saliva, etc), etc.

- Only DMQ is used and no disinfectant is available. DMQ is not a proper cleaning product.

- Clean uniforms are not provided after haircuts despite being covered in detainees' hair, blood and body fluids

Pg 11 of 26

<u>F. Services and Programs (Report at 24-25)</u>

Programs are virtually non-existant at DACDC. While Global Corrections Group rightly scored this area as "deficient" they failed to offer insight into the overall Services and Programs at DACDC. Because inmate morale and good behavior are certainly tied to program availability, it is rather odd this is the shortest section of the Report. The following statements written in the Report are written in a way that misrepresents the actual issues:

- "The Law Library consists of one (1) New Mexico State Law code book"

- "A review of facility policy revealed there is no reference to recreation time or clothing attire and how it is distributed"

- "Detainees are authorized to correspond with Executive and Legislative Branch officials through Special mail"

In addition to discussing the three material misrepresentation above, this section will fully evaluate: Mail, Telephones,

pg. 12 of 26