IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ERIK KHAN,

    Plaintiff,

v.                                                                       No. 15-cv-1151 MV/SMV

CHRIS BARELA, BOARD OF COUNTY
COMMISSIONERS OF DOÑA ANA COUNTY,
ARAMARK CORPORATION,
BILL STICKLES, and DAVID BEAM,

    Defendants.[1]

## ORDER TO SUBMIT *MARTINEZ* REPORT

THIS MATTER is before the Court on Plaintiff's Motion for Order Directing Preparation of Martinez Report [Doc. 128], docketed on October 13, 2020. Defendants[2] filed no response, and the time for doing so has passed. Plaintiff sued Defendants pursuant to 42 U.S.C. § 1983 seeking monetary damages. *See generally* [Doc. 100]. Plaintiff complains that the policies, practices, or customs of Defendants directly caused multiple violations of his constitutional rights while he was detained at the Doña Ana County Detention Center ("DACDC") over the course of four years as a pretrial detainee. *See id.* Having considered the Motion, the record, and the relevant law, and being otherwise fully advised in the premises, the Court will grant the Motion in part as described herein.

---

[1] This caption reflects the Defendants listed in the Third Amended Complaint, except that Plaintiff substituted Defendant David Beam for the John Doe Defendant on June 24, 2020. [Docs. 100, 109]. Moreover, Defendants Bill Stickles and David Beam were dismissed as parties on November 6, 2020. [Doc. 133]. Finally, in its Motion to Dismiss, Defendant Aramark states that its proper name is "Aramark Correctional Services, LLC." [Doc. 123].

[2] Claims remain pending against three Defendants: Chris Barela ("Barela"), Board of County Commissioners of Doña Ana County ("Board"), and Aramark Correctional Services, LLC ("Aramark").

**Order for the *Martinez* Report**

In order to develop a record sufficient to ascertain whether there are any factual or legal bases for Plaintiff's claims,[3] Defendants are **ORDERED** to submit materials that will help the Court resolve Plaintiff's claims, in the form of a *Martinez* report, as explained herein.

In a suit brought by a pro se prisoner, the court may order the defendants to investigate the incidents underlying the suit and to submit a report of the investigation, known as a "*Martinez* report." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991); *see Martinez v. Aaron*, 570 F.2d 317, 319–20 (10th Cir. 1978) (affirming the propriety and necessity of such reports). The *Martinez* report assists the court in determining whether there is a factual and legal basis for the prisoner's claims. *Hall*, 935 F.2d at 1109. The court may use the *Martinez* report in a variety of procedural situations, including when deciding whether to grant summary judgment, either on motion or sua sponte. *Id.* at 1109–11; *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (noting that district courts have the power to enter summary judgment sua sponte, as long as the opposing party was on notice). However, the prisoner must be given an opportunity to present evidence to controvert the facts set out in the report. *Hall*, 935 F.2d at 1109.

In this case, there are claims against multiple defendants and groups of defendants who are separately represented by counsel. Not all of the claims pertain to every defendant. Accordingly, the Court will order the separately represented defendants and groups of defendants to submit separate *Martinez* reports addressing only the allegations made against them. Defendants'

---

[3] Plaintiff alleges that he was detained at DACDC between May 9, 2012, and June 29, 2016, and all of his claims arise from events during those four years. [Doc. 100] at 2, ¶ 5. Therefore, all materials submitted by Defendants must address the claims over the course of those four years.

2

*Martinez* report must address the allegations against them as well as any defenses raised in their answer that they wish to pursue.

### Aramark

Plaintiff alleges that he was deprived of his right to receive information because the policies, practices, or customs of Aramark (together with other Defendants) prevented him from accessing hardcover books, newspapers, and newspaper clippings. *Id.* at 7–9, 19–21. Plaintiff claims Defendants' complete prohibition was without a legitimate penological justification and no reasonable alternatives were available. *Id.* at 19. Aramark must file a *Martinez* report addressing these allegations. This is the only claim Aramark's report must address.

### Barela and the Board

Plaintiff makes the same allegations regarding his right to receive information against Barela and the Board. It is not clear whether the policies and procedures described by Plaintiff are policies and procedures of Barela and the Board or of Aramark. Barela and the Board must also file a *Martinez* report addressing these allegations.

Second, Plaintiff alleges that he was unreasonably strip searched—including body-cavity visual inspections—on multiple occasions in 2016 after returning from the courthouse and medical trips because of Defendants' policies, practices, or customs. *Id.* at 9–13, 21–22. Plaintiff asserts that not all inmates[4] were strip searched before entering the general population after outside contact. *Id.* at 13. Rather, he alleges that he was strip searched as a punishment, pursuant to Defendants' policies, for exercising his rights to access the courts and medical care. *Id.*

---

[4] Although Plaintiff was a pretrial detainee at the time, the Court uses the term "inmate(s)" throughout this Order for simplicity and consistency.

Third, Plaintiff alleges that Defendants' policies, practices, or customs violated his right to exercise his religion. *Id.* at 23. Plaintiff complains that Defendants' policies prevented him from receiving a clock, prayer schedule, Muslim calendar, and a diet accommodation during Ramadan. *Id.* at 14, 23. Moreover, when Defendants updated their meal accommodation policy to allow for Ramadan accommodations, Plaintiff was served ham. *Id.* at 14–15. Plaintiff alleges that Defendants' policies placed a substantial burden on his right to freely exercise his religion, without a rational basis, with the intent to punish him, and that Defendants were deliberately indifferent to his free exercise rights. *Id.* at 23.

Fourth, Plaintiff alleges that Defendants established Christianity as the religion of DACDC, in violation of the Establishment Clause. *Id.* at 19. Plaintiff complains that Defendants officially promoted Christianity through "movie presentations, group sermons, free Bible studies, access to Christian literature, and/or free Bibles." *Id.* at 24. For example, Plaintiff alleges that DACDC employees officially introduced Christian ministers and compelled inmates to be respectful and listen to their sermons. *Id.* at 17–18, 24. He further alleges that one DACDC employee himself preached multiple sermons to inmates. *Id.* at 18. Plaintiff also asserts that Christian volunteers[5] and inmates were routinely permitted to disregard security protocols, such as when volunteers freely entered housing units without officer escorts and when officers allowed Christian prayers circles despite mandatory lockdowns. *Id.* at 16–18. Plaintiff alleges that Defendants' policies did not have a secular purpose, had a primary effect of advancing Christianity, and fostered government entanglement with religion. *Id.* at 25.

---

[5] Plaintiff explains that DACDC allows religious "volunteers" to enter the facility to provide religious services for inmates. [Doc. 100] at 15. The Court uses the term "volunteer" to refer to such persons.

4

Finally, Plaintiff alleges that Defendants, with the intent to discriminate, deprived him of equal protection of the law, based on his Muslim faith, and without legitimate penological justification. *Id.* at 15–16, 25. Plaintiff complains that Christian inmates had disproportionate access to religious group activities, Christian volunteers for religious counsel, free access to a religious library with Christian materials, and greeting cards with Christian religious messages; nothing comparable was provided for similarly situated Muslim inmates. *Id.* at 25–26. Moreover, Plaintiff asserts that Defendants sought out, supported, and introduced Christian speakers to address inmates but did not do the same for speakers of other religions, such as Islam. *Id.* at 26. Furthermore, Plaintiff alleges that when he met with a Muslim religious volunteer to celebrate a religious feast, Plaintiff was handcuffed to a table; Christian inmates were never handcuffed for religious meetings, and Christian volunteers were able to freely enter the housing unit without officer escorts. *Id.* at 16–17.

## Directions for Preparing the *Martinez* Report

Defendants' *Martinez* reports must address the allegations against them as well as any defenses raised in their answers that they wish to pursue. Defendants must abide by the following instructions in preparing their reports.

**1. Mail Claims and Strip Search Claim**

Specifically, Defendants must produce all materials relevant to Defendants' policies, practices, or customs regarding inmate mail (particularly hardcover books, newspapers, and newspaper clippings) and strip searches, including, but not limited to: any written or unwritten mail and strip search policies, what entity had authority over the policies' creation and implementation, any information related to the rationale for the policies, a list of Plaintiff's rejected

mail (if one exists) with the reasons for each rejection, a list of each time Plaintiff was strip searched at DACDC (if one exists) with the reason for each strip search, any grievances submitted by Plaintiff regarding mail or strip searches, and any and all pertinent policies and procedures.

   2. **Religious Claims**

Defendants must also produce all materials relevant to Defendants' policies, practices, or customs regarding religious accommodations, activities, and resources for inmates, including, but not limited to: diet accommodations, religious item accommodations, services, literature (including a list of book titles contained in the Chaplain's office), group activities, any compulsory religious sermons, practices for recruiting religious volunteers, security protocols regarding group activities and meetings with religious volunteers, what entity had authority over the relevant policies' creation and implementation, any information regarding oversight and/or training of Good News employees, any information regarding DACDC employees giving sermons, any memoranda from Chaplains Bill Stickles or David Beam that were explicitly or tacitly approved by Defendants, a list of expenditures spent by Defendants on religious programs or services or activities, a sworn statement describing the number of religious volunteers admitted to DACDC and their religious affiliation, any information regarding Plaintiff's requests for religious accommodations, any grievances submitted by Plaintiff regarding his religious complaints, and any and all pertinent policies and procedures.

### 3. Additional Instructions (General)

Defendants must also produce all job descriptions for the DACDC Director position, any performance reviews of Barela, and any training materials and policies for employees, contractors, and volunteers about the constitutional rights of inmates.[6]

In addition, Defendants must abide by the following instructions in preparing their report:

1) The report must include a written brief that discusses Plaintiff's claims. Factual assertions in the briefs must be supported by proof, such as affidavits or documents. *See Hayes v. Marriott*, 70 F.3d 1144, 1147–48 (10th Cir. 1995).

2) The report must state whether records pertaining to the allegations exist.

3) The report must state whether policies or regulations addressing the allegations exist.

4) If relevant records, policies, or regulations do exist, copies must be included as attachments to the reports. The attachments should be arranged in a logical order and must be properly authenticated by affidavits. *See Farmers All. Mut. Ins. Co. v. Naylor*, 452 F. Supp. 2d 1167, 1176–77 (D.N.M. 2006).

In addition, Defendants shall provide a *Vaughn* index[7] that includes a substantial description of any documents Defendants contend should not be disclosed. *In camera* review of those documents may be required by further Court order.

---

[6] Plaintiff's Motion contained a list of 20 specific categories of requested materials. The Court considered each of them and, where appropriate, included the requested materials in the above list. The requests for materials not mentioned in this Order are denied because the requests were either too broad or the materials were publicly available or not relevant.

[7] A *Vaughn* index is a compilation prepared by the government agency . . . listing each of the withheld documents and explaining the asserted reason for its nondisclosure." *Anderson v. Dep't of Health & Hum. Servs.*, 907 F.2d 936, 940 n.3 (10th Cir. 1990) (citing *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)).

The *Martinez* report must be filed and served on Plaintiff no later than **September 7, 2021**. Plaintiff must file his response or objections to the report no later than **October 21, 2021**. Defendants must file their reply, if any, no later than **November 8, 2021**.

**The parties are hereby given notice that the *Martinez* report may be used in deciding whether to grant summary judgment, either by motion or sua sponte. Therefore, the parties should submit whatever materials they consider relevant to Plaintiff's claims.**[8]

**IT IS SO ORDERED.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**

---

[8] Plaintiff requests "that the parties be directed to file a separate motion for summary judgment at a time they deem appropriate because his investigation is still ongoing." [Doc. 128] at 6. This request is denied. If Plaintiff "shows by affidavit or declaration that, for specified reasons, [he] *cannot present facts essential* to justify [his] opposition" to the motion for summary judgment, he may ask for the material(s) he wants at that time. Fed. R. Civ. P. 56(d) (emphasis added).